**NOT FOR PUBLICATION**                                        **CLOSED**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| DANIEL MCCABE, RUSSELL E. MCCABE, and DAVID MOTOVIDLAK, | : <br> : <br> : |
| Plaintiffs, | : **OPINION** <br> : |
| v. | : Civ. No. 01-5747 (WHW) <br> : <br> : |
| ERNST & YOUNG, LLP, NICHOLAS R. H. TOMS a/k/a NIC TOMS, HUGO BIERMANN, GREGORY THOMAS, EDWARDSTONE & COMPANY, INC., WAYNE CLEVINGER, JOSEPH ROBINSON, MIDMARK CAPITAL, LP, OTTO LEISTNER, BUNTER B.V.I., LTD., GEORGE POWCH, STEPHEN M. DUFF, THE CLARK ESTATES, INC., RAYMOND BROEK, DONALD ROWLEY, DOUGLAS L. DAVIS, BARBARA H. MORTORANO and JACQUI GERRARD, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants. | : <br> : |

**Walls, District Judge**

Defendant Ernst & Young, LLP, ("Defendant" or "Ernst & Young") moves for summary judgment on the Second, Fourth and Fifth Counts of the amended complaint. The motion is granted.

### FACTS AND PROCEDURAL BACKGROUND

Plaintiffs Daniel McCabe, Russell E. McCabe, and David Motovidlak have asserted claims under Section 10(b) of the Securities and Exchange Act (Fourth Count of the Amended Complaint), and common law fraud and negligent misrepresentation (Second and Fifth Counts of

the Amended Complaint, respectively), alleging that the Defendant issued a fraudulent audit report regarding the acquirer of the Plaintiffs' company.  As a result of the sale, Plaintiffs claim that they have lost between $34 and $48 million.[1]  (Plaintiffs' Counterstatement of Material Facts ("PCMF") at ¶¶ 56-57).  Defendant now moves for summary judgment on the grounds that there are no genuine issues of material facts that would permit a trier of fact to find for the Plaintiffs.

Plaintiffs Daniel McCabe, Russell E. McCabe and David Motovidlak are former officers and/or principal shareholders of Applied Tactical Systems, Inc. ("ATS"), a closely held, privately owned company that provided supply chain management hardware, software and systems. (Amended Complaint at ¶¶ 2-4; Defendant's Statement of Undisputed Facts ("DSUF") at ¶¶ 1-2; PCMF at ¶¶1-2).  Defendant Ernst & Young is a limited liability partnership formed under the laws of the State of Delaware.  (Amended Complaint at ¶ 6; Defendant's Answer at ¶ 6).  Ernst & Young is a "Big 5" public accounting firm with offices throughout the United States and is authorized to and regularly does business in this judicial district.  Id.

The following facts are undisputed, unless otherwise noted:

Beginning in October 2000, and ending on December 11, 2000, Plaintiffs negotiated the sale of ATS to Vertex Interactive, Inc. ("Vertex"), a larger, publicly-held supply chain management company.  (DSUF at ¶¶ 3, 5; PCMF at ¶¶ 3, 5).  The stock price of Vertex fluctuated during the period of negotiations from $7.66 per share to $18.50 per share.  (DSUF at ¶ 4; PCMF at ¶ 4).

---

[1] Plaintiffs' Amended Complaint calls for damages to be determined at trial, but demands judgment against the Defendant of not less than $40,000,000.  (Amended Complaint at ¶¶ 157, 181, 190).

On December 11, 2000, the parties entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which ATS and Vertex agreed to merge and Plaintiffs agreed to exchange all of their ATS shares for 3,000,000 unregistered shares of Vertex common stock.[2] (DSUF at ¶ 5; PCMF at ¶ 5).  In addition to the shares, Plaintiffs would also receive, among other things, Vertex stock options and a promise from Vertex to obtain an effective registration of the 3,000,000 shares and the shares underlying the options "within 15 days after such time as financial results covering at least 30 days of combined operations of Vertex and ATS have been published by Vertex...but in any event not later than May 14, 2001."  (PCMF at ¶ 5; Merger Agreement at 3.5(d)).  Under SEC Rule 144, those shares were restricted and subject to certain limitations on public resale, including a one-year holding period.  17 C.F.R. § 230.144. However, Vertex was required to register Plaintiffs' Vertex shares with the SEC by May 14, 2001, so that they would become freely tradable shortly thereafter.  (DSUF at ¶ 6; PCMF at ¶ 6).

Plaintiffs allege that in December of 2000, Ernst & Young issued unqualified audit reports on Vertex's financial statements (the "10-K") for the period ending September 30, 2000. (Amended Complaint at ¶ 8; DSUF at ¶ 18; PCMF at ¶ 53).  The Audit Opinion certified that Vertex's financial statements for 1999 and 2000 were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), audited in accordance with Generally Accepted Auditing Standards ("GAAS"), and presented fairly, in all material respects, the financial

---

[2]Vertex's stock price closed at $8.69 per share on December 11, 2000.  (DSUF at ¶ 8; PCMF at ¶ 8).

position of Vertex.  (PCMF at ¶ 54).  The merger closed on December 29, 2000.[3]  (DSUF at ¶ 9; PCMF at ¶ 9).

After the merger closed, Vertex failed to meet its earnings and revenue targets by a wide margin, and had trouble integrating ATS and the numerous other companies it had recently acquired.  (DSUF at ¶ 11; PCMF at ¶ 11).  The parties dispute, however, the reasons for these failures.  Defendant argues that as a result of the dramatic downturn in high tech stocks and the generally weak economy, Vertex found itself in a "no growth" market.[4]  (DSUF at ¶ 11).  It adds that the Plaintiffs themselves attribute the decline in value of their Vertex shares to a combination of growth problems, industry issues and mismanagement.[5]  (DSUF at ¶ 12).

---

[3]Vertex's stock price closed at $6.25 per share on December 29, 2000.  (DSUF at ¶ 10; PCMF at ¶ 10).

[4]In support of its argument, Defendant cites two market reports: H.C. Wainwright & Co., Inc., Equity Research - Vertex Interactive, Inc., *The Good, The Bad and The Ugly: New Alliances Formed, But Near-Term Results Will Likely Be Much Weaker; Estimates Sharply Reduced*, April 5, 2001, and *Vertex Reports Larger Than Expected Fiscal Q2:01 Loss; Reducing Our Estimates Further*, May 18, 2001.  (DSUF at ¶ 11).

[5]Defendant cites the deposition of Plaintiff Russell McCabe, who stated that Vertex's declining stock price was caused by a number of factors, including: (a) the delayed 10-Q; (b) the release of two press releases in February 2001 reporting different earnings statements; (c) the pressure on the market from the registration of five to eight million shares; (d) the street's loss of confidence in Vertex management; (e) inappropriately high expectations and subsequent underperformance; (f) the non-performance of the bug-ridden RSI product; (g) Vertex's inability to deliver financial reports to the street; and (h) senior Vertex's mismanagement and lack of real understanding of business including the provision of unrealistic prejections to the street. McCabe also perceived that Vertex ran "off a spreadsheet" in that senior management would dream up numbers for the following quarter but then have no idea how to achieve those goals. (Russell McCabe Deposition at 245:09-251:09).
Plaintiff Daniel McCabe hypothesized that the decrease in Vertex revenues from 2000 to 2001 was caused by one or more of the following factors: marketing, spending, number of leads, lead conversion rate, average deal size, and/or product mix.  (Daniel McCabe Dep. at 104:06-111:17, 114:15-122:08).

Plaintiffs dispute Defendant's assertions, and argue that the failure was not caused by the "downturn in high tech stocks," but was caused by Vertex's (a) failure to pay its vendors resulting in the inability to fulfill customer orders; (b) failure to properly manage its expenses; (c) breach of its various agreements to make payments and to register the shares of stock used as consideration in various acquisitions; and (d) failure to properly manage its business.[6]  (PCMF at ¶ 11, citing depositions of Roger Henley, Walter Reichman, and Russell McCabe).

By May 14, 2001, the date by which Vertex had promised to register Plaintiffs' shares, Vertex's stock price had fallen to approximately $2.48.  (DSUF at ¶ 14; PCMF at ¶ 14).  Vertex then failed to register Plaintiffs' shares, it's economic slide continued, and by July 2002, Plaintiffs had sold their shares in private transactions, realizing gross proceeds of approximately $940,000.  (DSUF at ¶ 16; PCMF at ¶ 16).

Following Vertex's failure to register the shares, Plaintiffs learned that before the merger, Vertex had issued unregistered shares in connection with two previous mergers and a private placement, but had failed to comply with its contractual obligations to file registration statements concerning those shares by September 30, 2000.[7]  (DSUF at ¶ 17; PCMF at ¶¶ 17, 58- 59).  Plaintiffs also claim to have learned that before December 11, 2000, the former shareholders of

---

[6]Plaintiffs cite the depositions of Roger Henley, Walter Reichman and Russell McCabe in support of this argument. Henley and Reichman were the principals of two companies, CSI and PDI, respectively, that merged with Vertex before ATS's merger.  Henley and Reichman both threatened to sue Vertex for failure to register their stock following the completion of their respective mergers.  McCabe was one of the former shareholders of ATS, and is a Plaintiff in this action.

[7]The companies involved in the two previous mergers were CSI and PDI, owned by Roger Henley and Walter Reichman, respectively. (See supra fn. 6).

those companies involved in the two previous mergers with Vertex threatened to sue both Ernst & Young and Vertex for the damages they allegedly sustained as a result of Vertex's registration defaults. (PCMF at ¶ 60). Plaintiffs allege that Defendant had knowledge of the previous registration defaults and threatened lawsuits, but consciously decided to not disclose them in Vertex's financial statements. (PCMF at ¶¶ 60-61, 64).

In September of 2001, Plaintiffs commenced an arbitration against Vertex, asserting claims under negligent misrepresentation for failing to disclose its previous registration defaults, fraud, violation of Federal and New Jersey RICO statutes, breach of contract, and failure of consideration. (DSUF at ¶ 17; PCMF at ¶ 17). Plaintiffs sought damages of $25,000,000, the return of ATS to Plaintiffs, back pay, punitive and treble damages, and attorneys' fees. (PCMF at ¶ 17).

In December of 2001, Plaintiffs filed this action against, inter alia, the officers, directors and shareholders of Vertex, and Ernst & Young, alleging that Ernst & Young failed to disclose the previous registration defaults. (DSUF at ¶ 20; PCMF at ¶ 20). Plaintiffs asserted claims for (1) common law fraud, (2) violation of Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"), (3) negligent misrepresentation, (4) violation of Section 14(a) of the Exchange Act, (5) violation of Section 20(a) of the Exchange Act, (6) violation of Section 12(a)(2) of the Securities Act of 1933 (the "33 Act"), (7) violation of Section 15 of the 33 Act, and (8) violation of RICO statutes. (PCMF at ¶ 20).

In November of 2002, Plaintiffs accepted $4 million in settlement of their claims against Vertex, leaving Ernst & Young as the sole remaining Defendant. (DSUF at ¶ 22; PCMF at ¶ 22).

The Amended Complaint asserts three claims against Ernst & Young: violation of Section 10(b) of the Securities and Exchange Act of 1934 (Fourth Count), common law fraud (Second Count), and negligent misrepresentation (Fifth Count).  All of the claims are based on the same alleged omission - that Vertex had previously failed to register stock, and had been threatened with lawsuits as a result.  Plaintiffs argue that this information should have been disclosed in Vertex's fiscal 2000 financial statements, adding that had they known this information, they would not have entered into the Merger Agreement.  (DSUF at ¶ 23; PCMF at ¶ 23).

Plaintiffs and Defendant have each retained an expert economist to render an opinion concerning the amount and cause of any damages suffered by Plaintiffs.  Defendant's expert is Dr. Kenneth Lehn, former Chief Economist for the Securities and Exchange Commission and currently a professor of economics at the University of Pittsburgh.  (DSUF at ¶ 24; PCMF at ¶ 24).  Dr. Lehn reviewed all public information during the relevant period regarding Vertex shares and determined that the market did not become aware of any news even arguably related to Vertex's earlier delays in registering shares until January 25, 2002, when Vertex publicly disclosed in a 10-K filing that an action had been commenced by former shareholders of one of the previously acquired companies.  (DSUF at ¶ 25).  Dr. Lehn then analyzed the reaction of Vertex's stock price to that news and determined that the price did not move in a statistically significant amount, indicating that investors did not believe this information to be material. (DSUF at ¶ 26).  Consequently, Dr. Lehn concluded that none of the decline in value of Plaintiffs' shares from December 11, 2000 (the date of the Merger Agreement) through June 28, 2002 (the date by which Plaintiffs sold all of their ATS shares) was caused by the emergence of

"the truth" regarding Ernst & Young's alleged misrepresentation.  (DSUF at ¶ 27).  In other words, Plaintiffs suffered zero damages as a result of the alleged fraud.  Id.

Plaintiffs dispute Defendant's statements regarding Dr. Lehn.  Plaintiffs argue that Dr. Lehn reviewed only Vertex's stock price response to announcements regarding the company's alleged defaults.  (PCMF at ¶ 25).  Moreover, Dr. Lehn admits that he did not attempt to distinguish the market's reaction to the alleged (and disputed) disclosure on January 25, 2002 and Vertex's investor conference call on the morning of January 28, 2002.  Id.

Plaintiffs' expert is Dr. John Finnerty, a Professor of Finance at Fordham University. According to the Defendant, Dr. Finnerty did not render an opinion on, or analyze the reasons for the decline in value of Vertex's stock, nor did he attempt to value the Vertex shares received by Plaintiffs in the merger.  (DSUF at ¶ 28-29).  Rather, Dr. Finnerty opines that Plaintiffs' company, ATS, was worth $34 to $48 million at the time of the Merger and that Plaintiffs' damages are equal to the difference between the value of the company they sold to Vertex and the value they realized in return when they sold their Vertex shares in 2002.  (DSUF at ¶ 30).

Plaintiffs dispute Defendant's characterization of Dr. Finnerty's testimony.  Plaintiffs state that during the deposition of Dr. Finnerty, Ernst & Young inquired into what Dr. Finnerty believed the value of the package of consideration Plaintiffs received in exchange for ATS was. (Plaintiffs' Opposition ("Pls' Opp.") at p. 10, citing Finnerty Dec. ¶ 10; Kaplan Dec. Ex. F., pp. 56-59).  Dr. Finnerty replied that (a) he did not perform a valuation of the consideration Plaintiffs received, and (b) if one added up the total package of consideration, it would be within the range of his valuation of ATS.  Id.  Plaintiffs argue that Ernst & Young has mischaracterized this

-8-

testimony as an acknowledgment by the Plaintiffs that the value of what they received in exchange for ATS was equal to the value of ATS, resulting in no "out of pocket" damages. (Pls' Opp. at p. 10, <u>citing</u> Defendant's Brief ("Def's Br.") at p. 19 n. 6). A reasonable interpretation of this testimony, Plaintiffs argue, is that Dr. Finnerty was discussing the value of the package of consideration from the perspective of what Plaintiffs *believed* they were receiving at the time of the ATS Merger, before the revelation of Ernst & Young's audit failures. (Pls' Opp. at p. 11, <u>citing</u> Finnerty Dec. ¶ 11; Demareski Dec. Ex. 15, ¶ 5).

Defendant now moves for summary judgment on Plaintiffs' Second, Fourth and Fifth counts, on the grounds that Plaintiffs have failed to produce evidence sufficient to create a genuine issue of loss causation. Defendant argues that loss causation is a required element for claims brought under Section 10b-5 of the Securities and Exchange Act, common law fraud, and negligent misrepresentation. Loss causation requires that a plaintiff prove that the defendant's misstatement was the direct, or proximate, cause of his/her injury.

### LEGAL STANDARD

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. <u>See</u> <u>id.</u> at 248. The moving party must show that if the evidentiary material of record were

reduced to admissible evidence in court, it would be insufficient to permit the non-moving party

to carry its burden of proof.  See Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts in question."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  To survive a

motion for summary judgment, a non-movant must present more than a mere scintilla of

evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005).  The

opposing party must set forth specific facts showing a genuine issue for trial and may not rest

upon the mere allegations or denials of its pleadings.  Shields v. Zuccarini, 254 F.3d 476, 481 (3d

Cir. 2001).  At the summary judgment stage the Court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial.  See Anderson, 477 U.S. at 249.  In doing so, the Court must construe the facts and

inferences in the light most favorable to the non-moving party.  Curley v. Klem, 298 F.3d 271,

277 (3d Cir. 2002).

## DISCUSSION

I.   **Summary Judgment on Count Four - Section 10b of the Securities and Exchange
     Act and Rule 10b-5 Promulgated Thereunder**

Defendant argues that the alleged misrepresentations, Ernst & Young's failure to disclose

Vertex's failure to timely file registration statements in two previous mergers and a private

placement, and the failure to disclose the threatened litigation against Vertex, fail to satisfy the

loss causation requirement of Section 10(b) and Rule 10b-5 as the misstatements did not

proximately cause the decline in share value.  Plaintiffs argue that loss causation is satisfied

-10-

because the "misrepresentations and omissions caused or substantially contributed to Plaintiffs'
decision to sell ATS to Vertex, and as a result, Plaintiffs only received approximately $940,000
for their company."  (Pls' Opp. at p. 20).

### A.    Standard for Claims under Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or
employ[ment]... of any... deceptive device," (2) "in connection with the purchase or sale of any
security," and (3) "in contravention of" Securities and Exchange Commission "rules and
regulations."  15 U.S.C. § 78j(b).  Rule 10b-5 forbids, among other things, the making of any
"untrue statement of material fact" or the omission of any material fact "necessary in order to
make the statements made...not misleading."  17 C.F.R. § 240.10b-5 (2005).

To establish a claim for securities fraud under Section 10(b) of the 1934 Act, a plaintiff
must prove that (1) the defendant made a material misstatement or omission; (2) the defendant
acted with scienter; (3) the defendant made the misstatement in connection with the purchase or
sale of a security; (4) the plaintiff reasonably relied on the defendant's misstatement ("transaction
causation"); (5) the plaintiff suffered an economic loss; and (6) the misstatement was causally
connected to the loss ("loss causation").  Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627,
1631 (2005); In re Ikon Office Solutions, Inc. Sec. Litig., 277 F.3d 658, 666 (3d Cir. 2002); EP
MedSystems, Inc.v. EchoCath, Inc., 235 F.3d 865, 871 (3d Cir. 2000).  The Private Securities
Law Reform Act (PSLRA) expressly imposes on plaintiffs "the burden of proving" that the
defendant's misrepresentations or omissions "caused the loss for which the plaintiff seeks to
recover."  15 U.S.C. §§ 78u-4(b)(4).

-11-

"It is settled that causation under federal securities law is two-pronged: a plaintiff must allege both transaction causation, *i.e.*, that *but for*, the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, *i.e.*, that the subject of the fraudulent statement or omission was the cause of the actual loss suffered."  Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001); see also Newton v. Merrill Lynch, Pierce, Fenner & Smith,  259 F.3d 154, 172-73 (3d Cir. 2001).  To establish loss causation, a plaintiff must establish that the defendant's misrepresentations or omissions directly or proximately caused the economic losses incurred.  EP MedSystems, 235 F.3d at 883-84.

"Loss causation derives its function from the standard rule of tort law that the plaintiff must allege and prove that but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains."  Newton, 259 F.3d at 177 (citing Bastian v. Petren Res. Corp., 892 F.2d 680, 685 (7th Cir. 1990) (internal quotations omitted)).  This rule is otherwise referred to as "proximate cause."  The Fifth Circuit Court of Appeals has elaborated on this point:

> The plaintiff must prove not only that, had he known the truth, he would not have acted, but in addition that the untruth was in some reasonably direct, or proximate, way responsible for his loss.  The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value.  If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.

Huddleston v. Herman & MacLean, 640 F.2d 534, 549 (5th Cir. 1981).  The proximate cause requirement "prevents [S]ection 10(b) and Rule 10b-5 from becoming a system of investor insurance."  Rousseff v. E.F. Hutton Co., 843 F.2d 1326, 1329 (11th Cir. 1988).  The rationale is

-12-

that a person induced to purchase securities based upon a misrepresentation should not be permitted to recover when the value of the investment declines for reasons unrelated to the misrepresentation - for example, because of normal market forces.

**B.     Analysis**

Defendant first argues that the Plaintiffs have failed to meet the standard for alleging loss causation that was recently articulated in the Supreme Court's opinion, Dura Pharmaceuticals, Inc. v. Broudo.  In Dura, the respondents filed a securities fraud class action, alleging that the petitioners made misrepresentations about future Food and Drug Administration approval of a new asthmatic spray device, leading respondents to purchase Dura securities at an artificially inflated price.  125 S. Ct. at 1630.  The District Court dismissed the case, finding that the complaint failed to adequately allege loss causation - that is, a causal connection between the spray device misrepresentation and the economic loss, as required under the PSLRA.  Id.  The Ninth Circuit reversed, finding that a plaintiff can satisfy the loss causation requirement simply by alleging that a security's price at the time of purchase was inflated because of the misrepresentation.  Id.

The Supreme Court reversed the Ninth Circuit's holding, finding that plaintiffs failed to adequately allege proximate causation.  125 S. Ct. at 1633.  Specifically, the Supreme Court held that a plaintiff cannot satisfy the loss causation requirement of Section 10b-5 by simply alleging in the complaint, and later establishing that the purchase price of the security on the date of purchase was inflated because of the misrepresentation.  Id. at 1631.  To allege a sufficient cause of action, a plaintiff must allege that the share price fell significantly after the truth about the

misstatement or omission became known.  Id. at 1634.  The rationale of the Court was that at the

moment the plaintiffs purchased Dura's shares, the plaintiffs did not immediately suffer a loss.

Id. at 1631.  The loss would not have occurred until the truth about the FDA approvals became

known to the public, causing the share value to drop, and preventing the plaintiffs from

recouping the purchase value by re-selling the shares.  Id. at 1631-32.

Here, Defendant argues that Plaintiffs have failed to meet the standard of loss causation

established by Dura because "[t]hey offer *neither* evidence that the value of Vertex shares they

received in the Merger was less than what they paid *nor* evidence (as required by Dura) that the

market eventually became aware of E&Y's alleged misstatements and that Vertex's share price

declined as a result."  (Def's Br. at p. 11).  However, Dura appears to be limited to fraud-on-the-

market cases. The Ninth Circuit has addressed the scope of Dura in Living Holdings Ltd v.

Salomon Smith Barney, Inc., 416 F.3d 940 (9th Cir. 2005):

> Although the Supreme Court's decision in Dura Pharmaceuticals, Inc. v. Broudo, -
> -- U.S. ----, ---- - ----, 125 S.Ct. 1627, 1633-34, 161 L.Ed.2d 577 (2005) makes
> clear that in fraud-on-the-market cases involving publicly traded stocks, plaintiffs
> cannot plead loss causation simply by asserting that they purchased the security at
> issue at an artificially inflated price, the Court refused to consider "other
> proximate cause or loss-related questions." Here, at issue is a private sale of
> privately traded stock and [plaintiff] not only asserted that it purchased the
> security at issue at an artificially inflated price, but pled that the Defendants'
> misrepresentation was causally related to the loss it sustained.  Under these
> circumstances, Dura is not controlling.

416 F.3d at 943 n.1.  Additionally, in In re Initial Public Offering, No. MDL 1554, 2005 WL

1162445, at *3 (S.D.N.Y 2005), the Southern District of New York stated,  "Dura itself does not

define a pleading standard for loss causation; rather, it simply rejects the Ninth Circuit's standard

as overly permissive."  In re Initial Public Offering, 2005 WL 1162445, at *3 n.23.

-14-

The Third Circuit has addressed this issue in decisions that precede <u>Dura</u>, repeatedly emphasizing the importance of distinguishing typical securities actions, such as <u>Dura</u>, from other securities actions.  In a typical securities action, a plaintiff will complain that some announcement from the company fraudulently represents the state of affairs, thereby causing the share value to be artificially inflated.[8]  <u>EP MedSystems</u>, 235 F.3d at 884; <u>Newton</u>, 259 F.3d at 173.  The plaintiff then suffers a loss once the truth becomes publicly known.  235 F.3d at 884.  In a non-typical securities action, the Third Circuit has opined that while it is appropriate to take "guidance from the language of other cases enunciating general principles, the holdings are to some extent inapplicable [in non-typical securities cases]."[9]  235 F.3d at 884.

The Court agrees with the Plaintiffs to the extent that this case is not a typical securities action.  Unlike the <u>Dura</u> plaintiffs, Plaintiffs here "do not allege that they overpaid for open

---

[8]Typical securities actions generally involve the fraud-on-the-market theory, which means that when a buyer purchases shares in an otherwise efficient market, the buyer assumes that the share value reflects all publicly available information.  If the share value is artificially inflated due to a misstatement or omission, and the share later loses value after that misstatement or omission becomes public, a plaintiff will not have to prove reliance.  <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224 (1988).

In <u>EP MedSystems</u>, the Third Circuit provided examples of announcements from companies that have artificially inflated share values, including tender offers, <u>see Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 169 (3d Cir. 2000); earnings, <u>see In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410 (3d Cir. 1997); projected earnings, <u>see Weiner v. Quaker Oats Co.</u>, 129 F.3d 310 (3d Cir. 1997); or the company's financial condition, <u>see In re Westinghouse Sec. Litig.</u>, 90 F.3d 696 (3d Cir. 1996).

[9]The Third Circuit has also shed some light on what constitutes a general principle of loss causation.  In <u>Semerenko</u>, for example, the Third Circuit applied "general causation principles" when it found that the plaintiff's allegations "that the misrepresentations 'directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff' adequately pled loss causation."  <u>EP MedSystems</u>, 235 F.3d at 884 (citing <u>Semerenko</u>, 223 F.3d at 186).

-15-

market purchases of Vertex stock as a result of some market-wide fraud."  (Pls' Opp. at p. 23).

Rather, the Plaintiffs here were involved in a private transaction with Vertex.  Moreover,

Plaintiffs were restricted from reselling their shares until they were registered by Vertex, unlike

in a typical securities action where a plaintiff could recoup his purchase price by reselling shares

before the misstatement or omission became publicly known.  Plaintiffs were, in effect, locked

into the transaction from the time the merger closed until the shares were registered.  It follows

then that the holdings of <u>Dura</u> do not apply here.

Defendant argues that even if <u>Dura</u> does not apply, Plaintiffs still have not sufficiently

alleged that the Defendant's misrepresentation proximately caused their loss.  In particular,

Defendant claims that while the Plaintiffs' evidence may be sufficient to create a genuine issue as

to transaction causation, it is not sufficient to create a genuine issue of loss causation.

Plaintiffs argue that they were "induced to sell their company in exchange for Vertex

securities based on critical omissions - the failure to disclose the Registration Defaults - which

caused millions of dollars of losses and that, if disclosed, would have resulted in the transaction

never taking place."  (Pls' Opp. at p. 3).  As a factual basis for this claim, Plaintiffs cite Vertex's

previous failure to register shares in a private placement and two mergers (PCMF at ¶ 59); Ernst

& Young's knowledge of the Registration Defaults before issuing Vertex's 10-K in December

2000 (PCMF at ¶ 61); Ernst & Young's knowledge before issuing the 10-K that Plaintiffs would

rely on the integrity of Vertex's financial statements in consummating the sale of ATS to Vertex

(PCMF at ¶ 52); Ernst & Young's knowledge before issuing the 10-K that CSI and PDI had

threatened to sue Vertex for registration defaults (PCMF at ¶ 61); Ernst & Young's failure to

disclose the earlier registration defaults and threatened litigation  (PCMF at ¶¶ 54, 64 ); Vertex's

failure to register the Plaintiffs' stock by May 14, 2001 (PCMF at ¶ 56); Plaintiffs' inability to

resell their Vertex shares until the expiration of the applicable restrictions on resale on January

25, 2002 (PCMF at ¶¶ 56-57); and the fact that Plaintiffs would not have entered into the

transaction if they had known of the previous registration defaults and threatened litigation.

(PCMF at ¶ 63).  These facts, however, suggest transaction causation, not loss causation.  Proof

of transaction causation is not, without more, the same as proof of loss causation.  Cf., Citibank,

N.A. v. K-H Corporation, 968 F.2d 1489, 1495 (2d Cir. 1992) ("[I]n short, in the complaint

Citibank suggests no reason why the investment was wiped out.  [Citibank has] alleged the cause

of [its] entering into the transaction in which it lost money but not the cause of the transaction's

turning out to be a losing one." (citations omitted) (internal quotations omitted)) (comparing the

distinction between transaction and loss causation at the pleading stage with the distinction

between transaction and loss causation at the proof stage).

  Plaintiffs do, however, offer an explanation as to what caused Vertex's failure to meet its

earnings and revenue targets:

> Among the reasons for Vertex's failure to meet earnings and revenue targets was
> Vertex's (a) failure to pay its vendors resulting in the inability to fulfill customer
> orders, (b) failure to properly manage its expenses, (c) breach of its various
> agreements to make payments and to register the shares of stock used as
> consideration in various acquisitions, and (d) failure to properly manage its
> business.

(PCMF at ¶ 11).  Each of these events occurred following Plaintiffs' purchase of the Vertex

shares.  While part (c) cites Vertex's breach of its various agreements to make payments and

register stock issued to previous merger partners as a reason for the failure, Plaintiffs offer no evidence to support this conclusory statement.

This Court finds that while there is ample evidence for the Plaintiffs to create a genuine issue of transaction causation, the factual record is devoid of any evidence to create a genuine issue of loss causation.  Simply put, there is no evidence to create a genuine issue that Vertex's failure to register Plaintiffs shares caused the Plaintiffs' loss.

Plaintiffs argue, nevertheless, that there are cases that support its broad interpretation of loss causation.  In EP MedSystems, the plaintiff alleged that it was fraudulently induced into investing $1.4 million into EchoCath through misrepresentations that (i) EchoCath was in the mature stages of negotiations with four prominent companies to market certain new products and (ii) contracts with those companies were "imminent."  235 F.3d at 867.  However, in the fifteen months after the plaintiff completed its investment, EchoCath failed to enter into a single contract or to receive any income in connection with the marketing and development of its new products.  Id. at 869.  Plaintiff filed suit in the District of New Jersey, "alleging that EchoCath intentionally or recklessly made misrepresentations to MedSystems in connection with the sale of securities in an effort to induce MedSystems to purchase its securities, in violation of Section 10 of the Securities Exchange Act of 1934... and Rule 10b-5."  Id. at 869-70.  Plaintiff also alleged a supplemental state law fraud claim.  Id. at 870.

Defendant moved to dismiss the complaint for failure to state a claim, and the District Court granted the motion, concluding that the plaintiff failed to plead loss causation by failing to show a causal link between the alleged misrepresentations and the harm incurred when the

security was purchased and sold.  235 F.3d at 883.  The District Court stated "that the plaintiff

must show that the misrepresentations caused the decline in value, rather than merely induc[ed]

the transaction,... and noted that [the plaintiff] did not allege that the value of its investment had

declined, but rather that it ha[d] sustained substantial financial losses as a direct result of the

fraudulent misrepresentations [by the defendant]."  Id. (internal quotations omitted) (citations

omitted).

     In reversing the District Court, the Court of Appeals emphasized that this case differed

from typical securities actions, where plaintiffs complain that some announcement emanating

from the company fraudulently represented the actual state of affairs.  235 F.3d at 884.  Plaintiffs

in typical securities cases will then typically argue that they purchased the securities at a price

that was artificially inflated, only to suffer a loss when the true situation was made known.  Id.

EP MedSystems differed, according to the Circuit, because the plaintiff claimed that as a result of

fraudulent misrepresentations made by the defendant, it was induced to make an investment of

$1.4 million in EchoCath that turned out to be worthless.  Id.

     The central reason for the Court of Appeals' reversal of the District Court's dismissal,

however, was that the Circuit deemed it inappropriate to dismiss the plaintiff's complaint at the

pleading stage.  235 F.3d at 884-85.  Specifically, the Circuit noted that the "causation issue

becomes most critical at the proof stage.  Whether the plaintiff has proven causation is usually

reserved for the trier of fact."  Id. at 884.  The Circuit concluded:

> Although, as noted above, the allegation that it "sustained substantial
> financial losses as a direct result of the aforementioned misrepresentations
> and omissions on the part of EchoCath" could have more specifically
> connected the misrepresentation to the alleged loss, i.e., investment in a

> company with little prospects, when we draw all reasonable inferences in plaintiff's favor, we conclude that MedSystems has adequately alleged loss causation.

Id. at 885.

This case is readily distinguished from EP MedSystems, because the parties have already engaged in discovery, and are now at the summary judgment phase. The Circuit was evidently concerned in EP MedSystems with allowing the plaintiff to present evidence to a factfinder to show causation, rather than dismissing the case at the pleadings stage. That is not our issue. At oral argument of this motion, this Court stressed that its exploration was not to determine the adequacy of pleadings, but the availability of evidence for demonstration to a fact finder. Here, the parties have already had the opportunity to exchange interrogatories and depose each others experts, yet the Plaintiffs still cannot proffer any evidence to create a genuine issue as to whether Vertex's delayed registration caused their loss, other than to say that they would not have entered into the transaction had they known of Vertex's history of registration defaults and threatened litigation. EP MedSystems does not support the Plaintiffs' argument.[10]

Plaintiffs advance Marbury Management, Inc. v. Kohn, 629 F.2d 705 (2d Cir. 1980). Unfortunately for Plaintiffs, that Second Circuit case is 1) now disavowed by that Circuit, and 2) it is not and never was the law of this Third Circuit. See e.g., Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc., ---F.R.D.---, 2005 WL 3271498, *3 (D.Del. 2005).

_____

[10]Two other cases cited by Plaintiffs, Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001) and Rosen v. Communication Services Group, Inc., 155 F. Supp. 2d 310 (E.D. Pa. 2001) are also distinguished from this case because they addressed motions to dismiss, not motions for summary judgment.

The remaining cases cited by the Plaintiffs do not add support to their argument, as the Court in each case found a clear causal link between the misrepresentation and the losses suffered by the plaintiffs.  In re DaimlerChrysler AG Sec. Litig., 294 F. Supp. 2d 616, 629 (D.Del. 2003) (summary judgement denied because evidence created a genuine issue as to whether Defendant's mischaracterization of the merger as a merger of equals rather than as an acquisition prevented plaintiff from recovering control premium it would have received if the merger had been properly characterized);  Arthur Young & Co. v. Reves, 937 F.2d 1310, 1332 (8th Cir. 1991) (on appeal from denial of defendant's motion of judgment notwithstanding the verdict, Circuit found that defendant failed to disclose serious financial problems at agricultural co-op, which led directly to co-op's bankruptcy and to loss of plaintiff's entire investment). Unlike In re DaimlerChrysler AG. Sec Litig. and Arthur Young, Plaintiffs here have not offered any evidence to create a genuine issue of loss causation.

Plaintiffs' final argument is that Defendant "concedes that at least a portion of plaintiffs' losses are causally linked to [Defendant's] audit failures.  Dr. Lehn's expert report opines that had Vertex registered plaintiffs' shares by the May 14, 2001 deadline, plaintiffs would have received approximately $5.7 million in sales proceeds. (Lehn Dec. Ex. 1, ¶ 69)."  (Pls' Opp. at p. 25).   But that is not evidence of loss causation.  That opinion merely recites what may have occurred on a date certain.  Without more, that is not evidence that the failure to register proximately caused the loss complained of.  In a Section 10(b) case, a plaintiff must offer expert testimony demonstrating both the fact and the amount of damages caused by defendant's alleged wrongdoing.  Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 298-301 (3d Cir. 1991) (affirming

directed verdict due to plaintiff's failure to submit expert testimony concerning amount or cause of damages).  However, Plaintiffs' damages expert, Dr. Finnerty, offers only one damages opinion: the Plaintiffs' gave up assets valued between $34 and $47 million in exchange for their Vertex shares; they eventually sold those shares for $940,000; and they are entitled to recover the difference, approximately $33 to $46 million.  (Demareski Dec. Ex. 15, ¶ 32).  Plaintiffs' expert does not offer testimony to prove that the Plaintiffs would have received $5.7 million if the shares had been registered on time.  There is no evidence that the failure to register proximately caused the Plaintiffs' loss.

### C.    Conclusion

Having reviewed the evidence proffered by the Plaintiffs to support their claims, it is this Court's determination that the evidence is insufficient to create a genuine issue as to whether the Defendant's misrepresentations proximately caused the Plaintiffs' loss.  Plaintiffs' continuously emphasize that had they known of Vertex's previous failures to register shares and the threatened litigation, they would not have entered into the transaction.  Yet this evidence is only sufficient to create a genuine issue as to transaction causation, not loss causation.  This Court is not persuaded that the law of causation should be read under Section 10(b) and Rule 10b-5 to essentially abandon the distinction between the two.  Accordingly, Plaintiffs' claims under Section 10(b) and Rule 10b-5 must fail as a matter of law.  Defendant's motion for summary judgment on Plaintiffs' Section 10(b) and Rule 10b-5 claim is granted.

### II.    Summary Judgment on Counts Two and Five - Common Law Fraud and Negligent Misrepresentation

Defendant requests that this Court grant summary judgment on Plaintiffs' state law

claims on the grounds that Plaintiffs have failed to create a genuine issue as to whether Defendant's misrepresentation proximately caused their loss.  Plaintiffs argue that to establish proximate cause to support their common law claims, they need only demonstrate that Defendant's conduct was a "substantial factor" in bringing about their injury.

**A.      Standard for Claims under Common Law Fraud and Negligent Misrepresentation**

To succeed on a claim for common law fraud in New Jersey, a plaintiff must prove five elements**:** (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. Perry v. Gold & Laine, P.C., 371 F. Supp. 2d 622, 627 (D.N.J. 2005).  Negligent misrepresentation requires proof that an incorrect statement was negligently made and justifiably relied upon and that injury was sustained as a consequence of that reliance.  Kaufman v. i-Stat Corp., 165 N.J. 94, 109 (2000) (quoting H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983)).

**B.      Analysis**

To begin, this Court is unaware of any New Jersey authorities that address the precise issue raised by this case: whether a plaintiff seeking to recover his investment losses must prove, as an element of his claim for fraud or negligent misrepresentation, that the defendant's alleged misrepresentations proximately caused the securities to lose their value.  Numerous other federal courts have faced this issue, however, and have uniformly dismissed common law claims for fraud and negligent misrepresentation for failure to plead or prove proximate causation.  The reasons for this are that (1) proximate causation is an essential element of these common law

-23-

claims; and (2) "loss causation" is simply the application of traditional common law notions of proximate cause to complex fact patterns presented by federal securities fraud actions.[11]

In Edward J. DeBartolo Corp. v. Coopers & Lybrand, 928 F. Supp. 557 (W.D. Pa 1996), plaintiffs invested in a company, Phar-Mor, in reliance on defendant's misleading audit reports on Phar-Mor's financial statements.  Id. at 561.  After the jury found for plaintiffs on all claims, the defendant auditor moved for judgment notwithstanding the verdict.  Id. at 559.  The District Court held that there was sufficient evidence to support the verdict, but granted the motion in part - on both the 10(b) and common law fraud claims - because plaintiffs had failed to prove that certain of their losses were caused by the auditors' misrepresentations.  Id. at 563. The Court noted:

> ...we agree that loss causation is not a requirement for a common law fraud claim. However, in order to prove a cause of action for fraud under Pennsylvania law, a plaintiff must establish damage as a proximate result of misrepresentation.  Gibbs v. Ernst, 538 Pa. 193, 647 A.2d 882, 889 (1994).  Proximate cause is established by evidence that the conduct at issue was a "substantial factor" in bringing about the plaintiff's harm.  Whitner v. Von Hintz, 437 Pa. 448, 263 A.2d 889 (1970). Because loss causation reflects the rule of proximate cause borrowed for use in the federal securities law context, we find that loss causation is instructive in determining whether the DeBartolo Plaintiffs have proved by clear and convincing evidence that the losses suffered on their early year purchases were caused by Coopers' failure to perform GAAS audits....

Id. at 563.

---

[11]  Professor Prosser explains the common law rule of proximate cause in similar cases:

if false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market, or insolvency of the corporation brought about by business conditions or other factors in no way relate[d] to the representations will not afford any basis for recovery.

W.P. Keeton et al., Prosser and Keeton on the Law of Torts § 110, at 767 (5th ed. 1984).

Similarly, in Citibank, N.A., discussed earlier, the Second Circuit dismissed the plaintiff's common law fraud claims, finding that "Citibank did not adequately allege that the damages it suffered were proximately caused by the alleged misrepresentations of [the defendants]." 968 F.2d at 1496. In another New York case, AUSA Life Ins. Co. v. Ernst & Young, 119 F. Supp. 2d 394 (S.D.N.Y. 2000), aff'd, 39 Fed. Appx. 667 (2d Cir. 2002), the District Court stated:

> As with a claim under Section 10(b) of the federal securities law, a claim for securities fraud under New York common law requires proof not only that the defendant's misrepresentation induced the plaintiff to enter into the transaction but also caused the plaintiff's loss thereon.

119 F. Supp. 2d at 398. The Court dismissed the 10(b) as well as the common law fraud and misrepresentation claims for failure to plead loss causation. Some other examples of state law claims dismissed for failure to plead or prove loss causation include Greenberg v. DeTessieres, 902 F.2d 1002 (D.C. Cir. 1990) (applying D.C. law); Hampshire Equity Partners II, L.P. v. Teradyne, Inc., 2005 WL 736217 (S.D.N.Y. 2005); and Kimbrell v. Adia, S.A., 929 F. Supp. 373 (D.Kan. 1996).

This Court sees no reason why New Jersey law would differ. To recover their investment losses under common law fraud or negligent misrepresentation, Plaintiffs must prove that Defendant's alleged misrepresentations proximately caused their loss.

Plaintiffs argue that to establish proximate cause, they need only demonstrate that the Defendant's conduct was a "substantial factor" in bringing about their injury, even though there might be other concurrent causes of the harm. (Pls' Opp. at p. 28, citing Froom v. Perel, 377 N.J. Super. 298, 313 (N.J. Super. Ct. App. Div. 2005) ("[t]he test of proximate cause is satisfied

where the negligent conduct is a substantial contributing factor in causing the loss")).  "The substantial factor test accounts for the fact that there can be any number of intervening causes between the initial wrongful act and the final injurious consequence and does not require an unsevered connecting link between the negligent conduct and the ultimate harm."  Conklin v. Hannoch Weisman, 145 N.J. 395, 420 (N.J.1996).

The substantial factor test is not read as broadly, however, as Plaintiffs would like. Defendant cites In re House of Drugs, Inc., 251 B.R. 206 (Bankr. D.N.J. 2000) to show that Plaintiffs' reliance on the alleged misstatement is insufficient under the substantial factor test. There, the plaintiff who had leased space in a shopping mall brought suit against the landlord for failing to disclose during lease negotiations that two of the mall's anchor tenants would soon be vacating the premises.  Plaintiff claimed that it relied on the Defendant's omission in entering the lease, and that it experienced a substantial decline in sales when the anchor tenants left.  Id. at 213.  However, the plaintiff failed to prove what portion, if any, of that decline in sales was attributable to the loss of the anchor tenants as opposed to other factors.  Id.  The Court applied New Jersey common law and dismissed the claim, holding that the plaintiff failed to prove that it was damaged by the alleged fraud.  Id.  Here there is no evidence available to a reasonable fact finder to determine the loss was caused by the failure to register the securities.

Some additional guidance on this issue can be gleaned from New York common law, which employs a "substantial factor" test identical to New Jersey's.  See e.g., Galioto v. Lakeside Hosp., 123 A.D.2d 421, 422 (N.Y. App. Div. 1986) ("in order for a plaintiff to recover damages, a defendant's negligence need not be the sole cause of the injury; it need only have been a

substantial factor in bringing the injury about." (citations omitted)).  In <u>Aronof v. Ernst & Young</u>, 1999 WL 458779 (N.Y. Sup. Ct. Apr. 26, 1999), <u>aff'd</u>, 725 N.Y.S.2d 31 (N.Y. App. Div. 1st Dep't 2001), plaintiffs alleged that they had invested in the defendant's audit client, JWP, in reliance on audited financial statements misrepresenting JWP's financial condition.  The Court held that to succeed on their claims, the plaintiffs needed to show both reliance and loss causation.  <u>Id.</u> at *3 ("To prevail on their fraud claim, plaintiffs must show both that they reasonably relied upon the misrepresentations contained in the financial statements and that such misrepresentation caused their loss." (citations omitted)).   In granting summary judgment, the Court rejected an argument similar to the one advanced by plaintiffs here:

> Plaintiffs argue that for purposes of demonstrating loss causation, it is sufficient to demonstrate that the misrepresentations were a substantial factor in inducing [them] to enter into the agreement.  This assertion is unpersuasive.  The record supports the conclusion that [plaintiffs' losses]...resulted from later reversals due to the acquisition of Businessland, and the possible contributing factors of a slow construction market, and increased competition in the personal computer industry. Hence, JWP's failure to honor the guarantee resulted from unforeseeable events thereby breaking the chain of causation.

 <u>Id.</u>  Just as the chain of causation was broken in <u>Aronof</u> by unforeseeable events that occurred after the plaintiff entered into the agreement, so too was the chain broken in this case by a number of unforeseeable events, including, as previously mentioned, growth problems, industry issues, and mismanagement.  (<u>See</u> Russell McCabe Deposition at 245:09-251:09; Daniel McCabe Deposition at 104:06-111:17, 114:15-122:08; PCMF at ¶ 11).   By the look of appropriate, relevant evidence, Plaintiffs have failed to create a genuine issue of Ernst & Young's alleged misrepresentations proximately causing their loss.

### C.    Conclusion

Because Plaintiffs have failed to create a genuine issue as to loss causation, it follows that

Plaintiffs' common law fraud and negligent misrepresentation claims must fail as a matter of

law.  Defendant's motion for summary judgment on Counts Two and Five of the Plaintiffs'

complaint is granted.


<u>**s/ William H. Walls, U.S.D.J.**</u>
United States District Judge

**Appearances**

Steven M. Kaplan
KAPLAN & LEVENSON LLP
630 Third Avenue
New York, New York 10017

Attorney for Plaintiffs

Kevin H. Marino
Craig S. Demareski
MARINO & ASSOCIATES, P.C.
One Newark Center
Newark, New Jersey 07102

Michael L. Rugen
Samuel L. Barkin
HELLER EHRMAN LLP
7 Times Square
New York, New York 10036

Attorneys for Defendant